BARKETT, Circuit Judge, dissenting, in which HATCHETT, Chief Judge, KRAVITCH and HENDERSON, Senior Circuit Judges, join::

In this case it is alleged that a fifth-grade student, Lashonda Davis, was sexually harassed for over six months at school by another student, culminating in a sexual battery for which her harasser pled guilty in state court. It is also alleged that school officials were completely aware of the escalating gravity of the situation and took no meaningful action to deter it. The majority holds that no matter how egregious--or even criminal--the harassing discriminatory conduct may be, and no matter how cognizant of it supervisors may become--a teacher could observe it directly and regularly--there would be no obligation to take any action to prevent it under the very law which was passed to eliminate sexual discrimination in our public schools. To reach this conclusion the majority ignores the plain meaning of Title IX as well as its spirit and purpose. I suggest that under appropriate statutory analysis as well as Supreme Court precedent, Davis has stated a cause of action.

The first principle in statutory analysis requires that a statute be accorded the plain meaning of its text. It is well established that "[c]ourts must assume that Congress intended the ordinary meaning of the words it used, and absent a clearly expressed legislative intent to the contrary, that language is generally dispositive." Gonzalez v. McNary, 980 F.2d 1418, 1420 (11th Cir. 1993) (internal citation omitted). The Supreme Court has emphasized that "only the most extraordinary showing of contrary intentions from [legislative history] would justify a limitation on the 'plain meaning' of the statutory language." Garcia v. United States, 469 U.S. 70, 75 (1984). The text of Title IX provides in pertinent part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

20 U.S.C. § 1681(a). There is no ambiguity in this language. It is undisputed that the Monroe County School System is a recipient of federal financial assistance. It is also well established that hostile environment sexual harassment is a form of intentional discrimination which exposes

1

one sex to disadvantageous terms or conditions to which members of the other sex are not exposed.  See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986); see also Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 75 (1992) (hostile environment for student created by teacher is a form of discrimination cognizable under Title IX).  The absolute prohibition contained in the text is framed solely in terms of who is protected.  The identity of the perpetrator is simply irrelevant under the language:  "No person . . . shall . . . be excluded from participation . . . , be denied the benefits of, or be subjected to discrimination . . . ."  Thus, under the statute's plain language, liability hinges upon whether the grant recipient maintained an educational environment that excluded any person from participating, denied them benefits, or subjected them to discrimination.

Should one need to interpret the statute, it must initially be noted that Title IX was designed to protect individuals from sex discrimination by denying federal financial aid to those educational institutions that bear responsibility for sexually discriminatory practices.  Cannon v. University of Chicago, 441 U.S. 677, 704 & n.36 (1979) (citing 117 Cong. Rec. 39252 (1971)).  "It is a strong and comprehensive measure which . . . is needed if we are to provide women with solid legal protection as they seek education and training for later careers . . . ."  Id. at 704 n.36 (quoting Sen. Birch Bayh, 118 Cong. Rec. 5806-07 (1972)).  Thus, in interpreting Title IX, "[t]here is no doubt that if we are to give [it] the scope that its origins dictate, we must accord it a sweep as broad as its language."  North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 521 (1982) (internal quotation marks omitted).

Moreover, the Office of Civil Rights of the Department of Education, the federal agency responsible for enforcement of Title IX, interprets the statutory language to impose liability on school officials for permitting an educational environment of severe, persistent, or pervasive peer sexual harassment when they know or should know about it, and fail to take immediate and appropriate corrective action to remedy it.  See Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12,034, at 12,039-

2

41 (1997). The OCR's final policy guidance explains that:

> a school's failure to respond to the existence of a hostile environment within its own programs or activities permits an atmosphere of sexual discrimination to permeate the educational program and results in discrimination prohibited by Title IX. . . . Thus, Title IX does not make a school responsible for the actions of harassing students, but rather for its <u>own</u> discrimination in failing to remedy it once the school has notice.

<u>Id.</u> at 12,039-40 (emphasis added).[1]

Notwithstanding the administrative interpretation of the statute, as well as its plain

meaning, the majority concludes that Congress did not intend to create a cause of action under

---

[1] It is worth noting that the OCR's interpretation of Title IX as holding schools liable for permitting peer sexual harassment is consistent with its interpretation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1964), as holding schools liable for allowing peer racial harassment. This is significant because the Supreme Court has noted that "Title IX was patterned after Title VI." <u>Cannon</u>, 441 U.S. at 694. As the majority points out, the language of the two statutes is virtually identical, and the Supreme Court has held that they should be interpreted in the same way. <u>See</u> Majority Op. at 21-22 (citing <u>Cannon</u>, 441 U.S. at 696). The OCR issued An Investigative Guidance on Racial Incidents and Harassment Against Students at Educational Institutions in 1994 providing, "[T]he existence of a racially hostile environment that is created, encouraged, accepted, tolerated or left uncorrected by a recipient also constitutes different treatment on the basis of race in violation of Title VI." <u>See</u> 59 Fed. Reg. 11,448, at 11,448 (1994). Furthermore, the OCR has stated that the obligation of school districts with notice to remedy racially hostile environments applies "regardless of the identity of the person(s) committing the harassment--a teacher, student, the grounds crew, a cafeteria worker, neighborhood teenagers, a visiting baseball team, a guest speaker, parents or others." <u>Id.</u> at 11,450. As explained by the OCR:
> Under this analysis, an alleged harasser need not be an agent or employee of the recipient, because this theory of liability under Title VI is premised on a recipient's general duty to provide a nondiscriminatory educational environment.

<u>Id.</u> at 11,449.

Additionally, it is interesting to note that shortly after the enactment of Title VI, the former Fifth Circuit recognized that school officials must take steps within their power to prevent racial harassment among students. In <u>United States v. Jefferson County Bd. of Educ.</u>, 380 F.2d 385 (5th Cir. 1967) (en banc), which is binding precedent in this circuit, <u>see</u> <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the court of appeals entered a model desegregation decree which complied with "the letter and spirit of the Civil Rights Act of 1964", <u>Jefferson County</u>, 380 F.2d at 390. The decree provided in relevant part:
> Within their authority school officials are responsible for the protection of persons exercising rights under or otherwise affected by this decree. They shall, without delay, take appropriate action with regard to any student or staff member who interferes with the successful operation of the plan. Such interference shall include harassment, intimidation, threats, hostile words or acts, and similar behavior.

<u>Id.</u> at 392.

Title IX for student-on-student sexual harassment based largely on an analysis of legislative history. The majority emphasizes that "throughout this long legislative history, the drafters of Title IX never discussed student-student sexual harassment . . . ." See Majority Op. at 18. Assuming this to be true, the mere fact that student-on-student sexual harassment may not have been specifically mentioned in the Congressional debates does not mean that it was not encompassed within Congress's broad intent of preventing students from being "subjected to discrimination" in federally funded educational programs. The majority suggests that it is clear that Congress was not concerned with student-on-student sexual harassment because the legislative history focused primarily on the issues of discrimination in "admission[s]," "available services or studies," and "employment within an institution," none of which were pertinent to the claim raised in this case. See Majority Op. at 13-14, 17. However, under this narrow view, even the cause of action under Title IX for teacher-on-student sexual harassment recognized by the Supreme Court in Franklin, 503 U.S. at 60, would not be supported by the majority's view of legislative history. In Franklin the Court considered a high-school student's Title IX suit alleging that a teacher had sexually harassed and assaulted her and that school officials, who had knowledge of the misconduct, had failed to intervene. Id. at 63-64. Surely the majority would not suggest that the cause of action that the Supreme Court recognized in Franklin does not exist simply because it was not specifically mentioned in the legislative history. Moreover, the majority's interpretation of the statute based on legislative history would suggest that by using the unqualified words "discrimination under any education program" Congress only intended to cover the narrow areas of admissions, services, and employment. This contravenes both common sense and the plain meaning of the words of the statute.

Furthermore, the majority contends that Title IX may not be construed as authorizing a cause of action for a school board's failure to remedy student-on-student sexual harassment because such an interpretation would conflict with the notice of liability requirement of the Spending Clause, which is the constitutional provision under which Title IX was ostensibly

4

enacted.[2] See Majority Op. at 22, 25-26 (citing Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 17 (1981)).  However, it is clear that the school board would have sufficient notice of liability based on the plain meaning of the statute, which unequivocally imposes liability on grant recipients for maintaining an educational environment in which students are subjected to discrimination.  Further, sufficient notice was provided to satisfy the Spending Clause prerequisite for a damages action under Title IX as set forth in Franklin, 503 U.S. at 74-75.   In Franklin the Court explained that the notice requirement for damages actions under the Spending Clause in Title IX cases is satisfied where the alleged violation was intentional.  Id.  The Court found that since sexual harassment constitutes intentional discrimination in violation of Title IX, the Spending Clause does not prohibit a cause of action for teacher-on-student sexual harassment under Title IX.  Id.  Similarly, in this case the alleged violation of Title IX was intentional because the school board knowingly permitted a student to be subjected to a hostile environment of sexual harassment.  See, e.g., Doe v. Petaluma City Sch. Dist., 949 F.Supp. 1415, 1422, 1427 (N.D.Cal. 1996) (holding that hostile environment sexual harassment constitutes "intentional discrimination," and that schools are liable under Title IX when they know or should know about student-on-student sexual harassment and fail to take prompt remedial action); Bruneau v. South Kortright Central Sch. Dist., 935 F.Supp. 162, 172 (N.D.N.Y. 1996) (recognizing that a school's failure to take corrective action in response to hostile environment created by peers despite actual notice of harassment subjects it to

---

[2]In Franklin, the Supreme Court assumed, without deciding, that Title IX was enacted pursuant to the Spending Clause.  Franklin, 503 U.S. at 75 & n.8.  It is also arguable that the provision was enacted pursuant to § 5 of the Fourteenth Amendment.  For purposes of this discussion, I will assume, like the majority, that the authorizing provision was the Spending Clause.

liability for intentional discrimination, and therefore to damages under Title IX); Burrow v. Postville Community Sch. Dist., 929 F.Supp. 1193, 1205 (N.D. Iowa 1996) (holding that intentional discrimination may be inferred from "the totality of relevant evidence, including evidence of the school's failure to prevent or stop the sexual harassment despite actual knowledge of the sexually harassing behavior of students over whom the school exercised some degree of control"); Oona R.-S. v. Santa Rosa City Schs., 890 F.Supp. 1452, 1464, 1469 (N.D. Cal. 1995) (explaining that discriminatory intent can be found in "the toleration of harassing behavior of male students, or the failure to take adequate steps to deter or punish peer harassment"); see also Canutillo Independent School Dist. v. Leija, 101 F.3d 393, 406 (5th Cir. 1996), cert. denied, 1991 WL 195227 (1997) (noting that "when the Supreme Court referred to 'intentional discrimination' in Franklin, it was referring to any form of discrimination other than disparate impact discrimination.").

Finding that Title IX authorizes a cause of action for student-on-student sexual harassment, we should then follow the lead of other courts, including the Supreme Court, in turning to Title VII principles to delineate the scope of the school board's duty and identify the elements of a cause of action under Title IX. In relevant part, Title VII requires an employer to take steps to assure that the working environment of its employees is free from sexual harassment[3] that is "sufficiently severe or pervasive to alter the conditions of the victim's

---

[3] Sexual harassment involves unwelcome sexual advances, requests for sexual favors, and other unwelcome verbal or physical conduct of a sexual nature. 29 C.F.R. § 1604.11(a) (1991). Such harassment constitutes actionable sex discrimination in the workplace either as "quid pro quo" sexual harassment, which conditions employment benefits upon sexual

employment and create an abusive working environment." Meritor, 477 U.S. at 67 (internal quotation marks and brackets omitted).

It is appropriate to turn to Title VII because the Supreme Court has explicitly relied on Title VII principles in explaining that sexual harassment constitutes intentional "discrimination" under Title IX:

> Unquestionably, Title IX placed on the Gwinnett County Public Schools the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986). We believe the same rule should apply when a teacher sexually harasses and abuses a student. Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe.

Franklin, 503 U.S. at 74-75. Significantly, the Court relied on Meritor, a Title VII case, to resolve the issue.

A well established line of cases preceded the Supreme Court's decision to use Title VII principles in resolving a Title IX case. Prior to Franklin, courts had held that such principles are applicable in Title IX suits brought by employees of educational institutions. See, e.g., Lipsett v. University of Puerto Rico, 864 F.2d 881, 897 (1st Cir.1988) (Title IX's legislative history "strongly suggests that Congress meant for similar substantive standards to apply under Title IX as had been developed under Title VII."); see also Preston v. Commonwealth of

---

favors, or as "hostile environment" sexual harassment, which creates an intimidating, hostile or offensive working environment that unreasonably interferes with an individual's work performance. See Meritor 477 U.S. at 62, 65.

<u>Virginia ex rel. New River Community College</u>, 31 F.3d 203, 207 (4th Cir. 1994); <u>Mabry v. State Bd. of Comm. Coll. & Occup. Educ.</u>, 813 F.2d 311, 316 n.6 (10th Cir. 1987), <u>cert. denied</u>, 484 U.S. 849 (1987).  Courts had also relied on Title VII when evaluating Title IX sexual harassment claims by students.  <u>See, e.g.</u>, <u>Moire v. Temple Univ. Sch. of Medicine</u>, 613 F. Supp. 1360, 1366 & n.2 (E.D. Pa. 1985), <u>aff'd</u>, 800 F.2d 1136 (3d Cir. 1986) (hostile environment sexual harassment); <u>Alexander v. Yale Univ.</u>, 459 F. Supp. 1, 4 (D. Conn. 1977), <u>aff'd</u>, 631 F.2d 178 (2d Cir. 1980) (*quid pro quo* sexual harassment).

Since the Supreme Court's <u>Franklin</u> case, at least two circuit courts have found that Title VII standards are applicable to students' Title IX sexual harassment claims.  <u>See</u> <u>Seamons v. Snow</u>, 84 F.3d 1226, 1232-33 & n.7 (10th Cir. 1996) (holding that although Title IX does protect against hostile environment sexual harassment in schools, plaintiff failed to state a valid claim because he did not allege that the harassment in question was based on sex); <u>Murray v. New York University College of Dentistry</u>, 57 F.3d 243, 249 (2d Cir. 1995) ("The [<u>Franklin</u>] Court's citation of <u>Meritor</u> . . . , a Title VII case, in support of <u>Franklin</u>'s central holding indicates that, in a Title IX suit for gender discrimination based on sexual harassment of a student, an educational institution may be held liable under standards similar to those applied in cases under Title VII."); <u>cf.</u> <u>Doe v. Petaluma City Sch. Dist.</u>, 54 F.3d 1447, 1452 (9th Cir. 1994) (holding that although an analogy to Title VII might be

8

available in future cases, the court need not reach the issue because defendant school counselor was entitled to qualified immunity against a claim that he failed to respond to known sexual harassment of the plaintiff by other students). But cf. Rowinsky v. Bryan Indep. Sch. Dist., 80 F.3d 1006, 1016 (5th Cir. 1996), cert. denied, 117 S.Ct. 165 (1996) (holding that student-on-student sexual harassment cannot be the basis for a cause of action under Title IX unless the plaintiff demonstrates that the school responded to sexual harassment claims differently based on sex.).

Additionally, virtually every district court to address the issue has held that Title IX, by analogy to Title VII, imposes liability on schools for failure to remedy severe and pervasive student-on-student sexual harassment. See, e.g., Bruneau, 935 F.Supp. at 172 ("When an employer fails to act to remedy a hostile environment created by co-workers the employer discriminates against an individual in violation of Title VII. Similarly, [this] Court finds that in the Title IX context, when an educational institution fails to take steps to remedy peer-on-peer sexual harassment, it should be held liable to the harassed student for that discriminatory conduct."); Bosley v. Kearney R-1 Sch. Dist., 904 F.Supp. 1006, 1021 (W.D. Mo. 1995) ("Following the [Franklin] Court's logic, the same rule as when an employer is held liable for a sexually hostile work environment under Title VII must apply when a school district has knowledge of a sexually hostile school environment and takes no action."); see

9

also <u>Nicole M. v. Martinez Unified School Dist.</u>, No. C-93-4531 MHP, 1997 WL 193919, at *8 (N.D. Cal. Apr. 15, 1997); <u>Collier v. William Penn Sch. Dist.</u>, 956 F.Supp. 1209, 1213-14 (E.D. Pa. 1997); <u>Franks v. Kentucky School for the Deaf</u>, 956 F.Supp. 741, 746 (E.D. Ky. 1996); <u>Petaluma</u>, 949 F.Supp. at 1427; <u>Wright v. Mason City Community Sch. Dist</u>., 940 F.Supp. 1412, 1419-20 (N.D. Iowa 1996); <u>Burrow</u>, 929 F.Supp. at 1205; <u>Oona R.-S.</u>, 890 F.Supp. at 1467-69 & n.13; <u>Patricia H. v. Berkely Unified Sch. Dist.</u>, 830 F.Supp. 1288, 1293 (N.D. Cal. 1993). <u>But see</u> <u>Garza v. Galena Park Indep.Sch. Dist.</u>, 914 F.Supp. 1437, 1438 (S.D. Tex. 1994).[4] Thus, the applicable case law firmly supports applying Title VII principles to delineate the scope of a school board's liability under Title IX for failure to remedy student-on-student sexual harassment.

Notwithstanding this abundant support for applying Title VII principles, the majority contends that Title VII principles may not be applied in this case because "the exposition of liability under Title VII depends upon agency principles." <u>See</u> Majority Op. at 25 n.14. The majority asserts that "[a]gency principles are useless in discussing liability for student-student harassment under Title IX, because students are not agents of the school board."[5] <u>Id.</u> This

_____

[4]The majority emphasizes that only district courts have held that a cause of action exists for student-on-student sexual harassment under Title IX. However, the number of district courts that have so held provides strong support for the theory advanced by appellants in this case.

[5] The majority also argues that Title VII case law is inapplicable to Title IX because Title IX, unlike Title VII, was enacted under the Spending Clause. However, the Supreme Court has relied on Title VII in analyzing claims under Title VI, which also was enacted under the spending power. In <u>Guardians Ass'n v. Civil Service Comm'n</u>, 463 U.S. 582 (1983), for example, the Court found that Title VI's

10

argument overlooks the Supreme Court's caveat in <u>Meritor</u> that "common law principles [of agency] may not be transferable in <u>all</u> their particulars to Title VII." <u>Meritor</u>, 477 U.S. at 72 (emphasis added).[6]   Under <u>Meritor</u>'s flexible approach, courts have held that an employer may be held liable under Title VII for failing to take action to remedy a hostile environment created by non-employees, who are certainly not agents of the employer.  <u>See, e.g.,</u> <u>Powell v. Las Vegas Hilton Corp.</u>, 841 F.Supp. 1024, 1028 (D. Nev. 1992) (denying motion to dismiss blackjack dealer's claim that her employer violated Title VII by failing to protect her from sexual harassment by gamblers at her table, because "an employer could be liable for the sexual harassment of employees by non-employees, including its customers"); <u>Magnuson v. Peak Technical Services, Inc.</u>, 808 F.Supp. 500, 512-13 (E.D. Va. 1992) (holding that employers of

---

prohibition of discrimination was "subject to the construction given the antidiscrimination proscription of Title VII in <u>Griggs v. Duke Power Co.</u> . . . ." <u>Guardians</u>, 463 U.S. at 592.  The Court also adopted Title VII's "business necessity" defense to analyze disparate impact claims in a Title VI case involving student placement.  <u>See</u> <u>Board of Educ. v. Harris</u>, 444 U.S. 130, 151 (1979).  Likewise, this court has utilized Title VII to analyze a disparate impact claim under Title VI, stating that "[t]he elements of a disparate impact claim may be gleaned by reference to cases decided under Title VII." <u>Georgia State Conf. of Branches of NAACP v. Georgia</u>, 775 F.2d 1403, 1417 (11th Cir. 1985).  Thus, the fact that Title VII is not a Spending Clause statute has not been a bar to importing its standards into Title VI, which formed the template for Title IX, and therefore should not be a bar to importing its standards into Title IX.

[6]As Judge Tjoflat has explained, "Title VII, as interpreted in <u>Meritor</u>, requires employers to take steps to ensure that sexual harassment does not permeate the workplace.  To the extent that the application of common law agency principles frustrates Title VII's goal of eliminating such harassment--by effectively relieving the employer of the responsibility of pursuing that goal--those principles must yield." <u>Faragher v. City of Boca Raton</u>, 111 F.3d 1530, 1544, 1546 n.2 (11th Cir. 1997) (Tjoflat, J., concurring in part, dissenting in part).

alleged victim can be held liable for failing to take corrective action to remedy hostile environment created by non-employee); see also Henson v. City of Dundee, 682 F.2d 897, 910 (11th Cir. 1982) ("The environment in which an employee works can be rendered offensive in an equal degree by the acts of supervisors, coworkers, or even strangers to the workplace.") (emphasis added) (internal citations omitted).[7]  The employers were held liable in these cases by virtue of their own failure to comply with the duty of eliminating discrimination under Title VII--not under any theory of vicarious liability for the acts of a third party.

Application of Title VII principles also recognizes that a student should have the same protection in school that an employee has in the workplace.[8]  See Franklin, 503 U.S. at 74-75.

_____

[7]Moreover, guidelines promulgated under Title VII recognize that an employer may be held liable for failing to take corrective action to remedy a hostile environment created by a third
party.  See 29 C.F.R. §1604.11(e) ("An employer may also be responsible for the acts of non-employees in the workplace . . ., where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action.").

[8]Indeed, where there are distinctions between the school environment and the workplace, they "serve only to emphasize the need for zealous protection against sex discrimination in the schools."  Patricia H., 830 F.Supp. at 1292-93.  The ability to control and influence behavior exists to an even greater extent in the classroom than in the workplace, as students look to their teachers for guidance as well as for protection.  The damage caused by sexual harassment also is arguably greater in the classroom than in the workplace, because the harassment has a greater and longer lasting impact on its young victims, and institutionalizes sexual harassment as accepted behavior. Moreover, "[a] nondiscriminatory environment is essential to maximum intellectual growth and is therefore an integral part of the educational benefits that a student receives.  A sexually abusive environment inhibits, if not prevents, the harassed student from developing her full intellectual potential and

12

Just as a working woman should not be required to "run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living," <u>Meritor</u>, 477 U.S. at 67 (internal citation omitted), a female student should not be required to run a gauntlet of sexual abuse in return for the privilege of being allowed to obtain an education.    In the employment context, women historically have not had the power to simply walk away from an environment that is made to be demeaning, embarrassing, and humiliating for them because of their gender.  Similarly, it is virtually impossible for female students to leave their assigned schools to escape an environment where they are harassed and intimidated on the basis of their gender.  Just as in the employment setting where employees are dependent on their employers to ensure workplace equality, so too students are dependent on teachers and school officials to control the educational environment. Additionally, sexual harassment--regardless of its source--subordinates girls in the classroom just as much as in the workforce.  Although a hostile environment can be created by someone who supervises or otherwise has power over the victim, a hostile environment can also be created by co-workers or fellow students who have no direct power relationship whatsoever with the victim.[9]  And like Title VII, Title IX was enacted to remedy that discrimination and ensure

---

receiving the most from the academic program."  <u>Id</u>. at 1293 (citation omitted).

[9]Numerous circuit courts, including this one, have held that an employer's failure to take prompt remedial action after notice of severe and pervasive sexual harassment by a co-worker is actionable. <u>See, e.g.,</u> <u>Henson v. City of Dundee</u>, 682 F.2d 897, 905 (11th Cir. 1982); <u>see also</u> <u>DeAngelis v. El Paso Municipal Police Officers Assoc.</u>, 51 F.3d 591, 593 (5th Cir. 1995); <u>Nichols v. Frank</u>, 42 F.3d 503, 508 (9th Cir. 1994);  <u>Carr v. Allison Gas Turbine Div. Gen. Motors Corp.</u>, 32 F.3d 1007, 1009 (7th Cir. 1994); <u>Karibian v. Columbia University</u>, 14 F.3d 773, 779 (2d Cir.), <u>cert. denied</u>, 114 S.Ct. 2693 (1994); <u>Kauffman v. Allied Signal, Inc., Autolite Div.</u>, 970 F.2d 178, 182 (6th Cir.), <u>cert. denied</u>, 113 S. Ct. 831 (1992); <u>Baker v. Weyerhaeuser Co.</u>, 903 F.2d 1342, 1345-46 (10th Cir. 1990);  <u>Hall v. Gus Construction Co.</u>, 842 F.2d 1010, 1015-16 (8th Cir. 1988).

sexual equality in public education.

Having determined that Title VII principles should guide our analysis of the scope of the school board's liability under Title IX, I conclude that Davis's allegations sufficiently plead a cause of action. The elements a plaintiff must prove to succeed in this type of sexual harassment case are: (1) that she is a member of a protected group; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of her education and create an abusive educational environment; and (5) that some basis for institutional liability has been established. See Meritor, 477 U.S. at 66-73; see also Harris v. Forklift Sys. Inc., 114 S. Ct. 367, 370-71 (1993); Lipsett, 864 F.2d at 898-902; Henson, 682 F.2d at 903-05.

Assumed as true, the facts alleged in the complaint, together with all reasonable inferences therefrom, satisfy these elements. There is no question that the allegations satisfy the first three requirements. First, as a female, LaShonda is a member of a protected group. Second, she was subject to unwelcome sexual harassment in the form of "verbal and physical conduct of a sexual nature." 29 C.F.R. § 1604.11(a). Third, the harassment LaShonda faced clearly was on the basis of her sex.

As to the fourth requirement, I recognize that a hostile environment in an educational setting is not created by simple childish behavior or by an offensive utterance, comment, or

14

vulgarity.  Rather, Title IX is violated "[w]hen the [educational environment] is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's [environment] and create an abusive environment,'" Harris, 114 S. Ct. at 370 (quoting Meritor, 477 U.S. at 65, 67) (internal citations omitted).  In determining whether a plaintiff has established that an environment is hostile or abusive, a court must be particularly concerned with (1) the frequency of the abusive conduct; (2) the conduct's severity; (3) whether it is physically threatening or humiliating rather than merely offensive; and (4) whether it unreasonably interferes with the plaintiff's performance.  Harris at 371.  The Court has explained that these factors must be viewed both objectively and subjectively.  If the conduct is not so severe or pervasive that a reasonable person would find it hostile or abusive, it is beyond Title IX's purview.  Similarly, if the plaintiff does not subjectively perceive the environment to be abusive, then the conduct has not actually altered the conditions of her learning environment, and there is no Title IX violation.  Id. at 370.

In this case, the five months of alleged harassment was sufficiently severe and pervasive to have altered the conditions of LaShonda's learning environment from both an objective and a subjective standpoint:  (1) G.F. engaged in abusive conduct toward LaShonda on at least eight occasions; (2) the conduct was sufficiently severe to result in criminal charges against G.F. to

15

which he pled guilty in state court; (3) the conduct, such as the groping and requests for sex, was physically threatening and humiliating rather than merely offensive; and (4) the conduct unreasonably interfered with LaShonda's academic performance, resulting in the substantial deterioration of her grades and emotional health.  The facts alleged go far beyond simple horseplay, childish vulgarities, or adolescent flirting.

Finally, I believe that the fifth and final element--whether any basis for the Board's liability has been shown, has likewise been sufficiently alleged.  Under Title VII, an employer may be held liable for a hostile environment of sexual harassment created by a co-worker if "the employer knew or should have known of the harassment in question and failed to take prompt remedial action."  Faragher, 111 F.3d at 1538; Henson, 682 F.2d at 905; see also Meritor, 477 U.S. at 72-73.  By analogy, in this instance the school board may be held liable if it knew or should have known of the harassment and failed to take timely remedial action.  In Title VII cases, an employee can demonstrate that the employer knew of the harassment "by showing that she complained to higher management of the harassment or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge."  Henson, 682 F.2d at 905. (citation omitted).  In this case, Davis has alleged that she told the principal--a higher level manager--of the harassment on several occasions.  She also alleged that at least three separate teachers, in addition to the principal, had actual

16

and repetitive knowledge from LaShonda, her mother and other students.  Finally, Davis alleged that despite this knowledge, the school officials failed to take prompt remedial action to end the harassment.[10]  These allegations regarding institutional liability, as well as the other allegations, are sufficient to establish a prima facie claim under Title IX for sexual discrimination due to the Board's failure to take action to remedy a sexually hostile environment.

For all the foregoing reasons, I would reverse the district court's dismissal of Davis's Title IX claim against the Board.

---

[10] The complaint also alleged that during the time of the harassment, the Board had no policy prohibiting the sexual harassment of students in its schools, and had not provided any policies or training to its employees on how to respond to student-on-student sexual harassment.

17